MONCURE), F.,
delivered the opinion of the court.
The court is of opinion that the debt in the proceedings mentioned, contracted on the 17th day of April, 1862, by P. J. Glover, with the appellee, Martha B. B. Jeffries, for the loan' of five thousand dollars, payable five years after date, with interest from the date, payable semiannually, and secured by the bond of the said Glover, and a deed of trust on real estate, was not, “according to the true understanding and agreement of the parties,” payable in Confederate States treasury notes, nor contracted with reference to such notes as a ^standard of value; and, therefore, that the said debt is not subject to be scaled in the mode prescribed by the acts of Assembly in such case made and provided. The money loaned had been deposited by the lender in the Bank of Virginia, in December 1860, or January 1861, and remained there, on deposit, until the date of the loan, when it was drawn out *839 by the borrower on the check of the lender. The bank was bound to pay specie or specie funds, in discharge of the check, and the borrower was not, any more than the lender, bound to receive anything else. If he received Confederate States treasury notes in payment of the check, which is quite probable, though the fact does not certainly appear, he received them volun-tar}', without any understanding or agreement to that effect with Mrs. Jeffries,and even without her knowledge, and no doubt because they suited his purposes as well as any other money; at least with the exception of specie; which could not then be gotten. Such notes were then comparatively little depreciated, and were of as much value, compared with specie, as bank notes or any other paper currency, or as legal-tender notes were when the principal of the debt became payable. The money having been deposited in bank before the war, the bank would no doubt have been willing to pay it out in bank notes, in discharge of the check, if the borrower had preferred or required it. And if he did not, it was probably because Confederate States treasury notes served his purpose just as well. The great length of time which the debt had to run, five years, confirms the view that it was not understood to be payable in Confederate States treasury notes. The parties could not then have contemplated that the war would last so long, or that such notes would be the currency when the debt would become payable. None of the parties, neither the lender, nor borrower, nor the appellant, the subsequent vendee of the land conveyed by the deed of trust, who assumed the payment of the *debt as part of the purchase money, contemplated that the debt would be paj'able in anything but good and lawful money at the time of its maturity; at least until long after the war, when, it seems for the first time, the appellant conceived the idea that it was payable in Confederate money, and subject to be scaled. The acts and declarations of all the said parties during the war repel such an idea. The debt was treated as a debt in good and lawful money, in the sale made by Glover to the appellant, of the laud conveyed by the deed of trust for its security. It is not pretended that in that transaction Glover represented that the debt was payable otherwise than in good money; but the effect of the transaction seems to have been, to leave in the hands of the purchaser, in part payment of the purchase money,, so much of it as could be sufficient to pay, in good money, the amount of the said debt at its maturity, with interest in the meantime, according to the terms of the bond and deed of trust, and to impose on the purchaser the obligation of making such payments. The appellant’s agreement, on the 30th of November 1864, to pay two thousand dollars in gold, within two months thereafter, in discharge of the said debt, repels the idea that he then considered it to be payable in Confederate States treasury notes.
The court is further of opinion, that the agreement of November 30, 1864, between Mrs. Jeffries and the appellant, called in the proceedings the “gold contract,” being exhibit “If” referred to in the bill, is a conditional agreement, expressly limited, by its terms, to the period of two months from its date; and not having been fully performed by the appellant by the payment to her of two thousand dollars in gold within that period, she was not bound to deliver up the said bond, and acquit him of all liability on account of the same, but he remained bound for the full amount thereof, subject to the credits endorsed thereon, crediting the gold payments *at two and a half times their amount, that being the ratio agreed on between the parties in their said agreement of November 30, 1864. The state of things which existed when the said agreement ivas entered into, the situation of the parties at that time, and all the surrounding circumstances, concur in showing that the parties actually intended what the terms of their agreement literally express, as aforesaid, and that time is of the essence of their agreement. Mrs. Jeffries would not have agreed to receive less than one half of the amount of the debt (even though paid in gold) in full payment of it, except under the circumstances which surrounded her at the time, and on the terms and condition expressed in the agreement. It was believed by the parties that those circumstances would continue to exist for at least two months, and therefore that period was given to the appellant for the full performance of the agreement. He well knew that he was bound by the agreement to make full payment within the two months in order to be entitled to have the bond delivered up, an to be acquitted from all liability on account of the same; and therefore he thought it necessary to ask her, as he says he did on the 29th of December 1864, when he made her a payment of $537 in gold, if she required the balance to be paid within the sixty days. She denies this allegation in her answer, and there is not sufficient proof of it to overcome the effect of such denial. But the allegation shows that he considered it necessary to procure her consent within the sixty days, to the extension of the time for the performance of the “gold contract” beyond that period.
The court is further of opinion, that the said agreement having failed of full effect by the failure of the appellant to make full payment of the said sum of two thousand dollars in gold within the said term of two months, it was not revived, nor extended to any period, definite, or indefinite, and certainly not to any period *beyond the actual existence of the war, (which alone had induced the agreement,) by anything which occurred after the expiration of the said term. The appellant alleges in his bill that “on the 29th day of December 1864, your complainant paid Mrs. Jeffries $537 in gold; at the time this payment was made, complainant asked Mrs. Jeffries if she required the balance to be *840 paid within the sixty days; she replied that she did not, that he might go on and pay it as soon as he could.” “He proceeded as rapidly as he could to make collections of gold, and on the 21st day of February 1865, he made another payment in gold of $206, and on the next day he paid $207 in gold, making, in the two payments, $413, which left a balance due from complainant of $722, as of the 30th day of January 1865. ” In answer to these allegations, Mrs. Jeffries says: “Your respondent denies that at the time of the paj’ment of the 29th of December 1864, she told Dr. Michie that she did ' not require the balance to be paid within the sixty days named in the contract, and ‘that he might go on and pay it as soon as he could.’ On the contrary, she well remembers that Dr. Michie, when he made the February payments, or one of them, said he supposed your respondent would not receive it, because the appointed time for payment (the sixty days) had run out. But in spite of this fact, your respondent did receive those payments. She did so, because the war wras still going on, and it was in precise accordance with the line of policy which prompted her to make the gold contract. But, in receiving these payments in conformity with the terms of the contract, your respondent did not, either in terms, or by implication, bind herself to receive still other payments in gold upon the same terms, especially if the war was over at the time they were proffered. ’ ’ The appellant and respondent were both examined as witnesses in the .case, and their testimony corresponds with what is stated in the .bill and answer respectively as 'x"aforesaid. There is no other testimony on the same subject, except that of Judge Ould, which confirms that of Mrs. Jeffries. We must take the facts, therefore, to be as stated by her, and so taking them, there can be no doubt or difficulty in deciding that the right to make payments on the gold contract ended, at least with the war, if not with the said period of two months from its date. That the appellant was himself of that opinion, is conclusively shown by the fact that he made no payment nor offer of any payment on account of that contract after the payment made in February 1865, as aforesaid. She wrote him on the 24th of April 1866, and again on the 1st August 1867, stating her necessities for money, urging him to pay the interest due on the balance of his debt, and representing the principal of that balance to be about eighteen hundred dollar's. Both of these letters were received by the appellant; and yet he answered neither of them until December 1, 1867, more than eighteen months after the date of the first, and four months after the date of the second. He then wrote to her, saying, “I must apologize for not answering the letter you wrote me last summer, by stating that I contemplated visiting Richmond in a short time, and thought it best to see you in person in regard to the money I owe you on Major Glover’s bond. I have, however, been prevented by business from taking the trip, and shall not be able to see you before the month of February, when you may rely on my paying you two years’ interest on the remainder of said bond. If you would prefer making a reasonable deduction on said bond, I will make an effort to pay all of the principal that has not heretofore been paid.” This letter is inconsistent with the idea that the writer then considered the gold contract as still subsisting; and the same maybe said of another letter, written by him to her, dated March 2, 1868; but it is needless to state its contents.
The court is further of opinion that the bond and deed *of trust are not tainted with usury; as fully appears from what has already been said. But if thejr were, there are two sufficient answers to the objection: 1st, that it was not made in the pleadings, nor otherwise, in the court below, but is made now, for the first time, in argument, in the appellate court, and therefore it comes too late; and, 2dly, it comes from the wrong quarter. Dr. Glover, on whom the usury is supposed to have been practiced, has waived the objection, if it could ever have been made, and so far as he is concerned, has, in effect, paid the money. He left it in the appellant’s hands for the use of the creditor, and the appellant is bound in good faith, both to the debtor and the creditor, to pay over to the creditor the money thus had and received to her use. A court of equity will not entertain him in his attempt to withhold it. He is met at the door of the court by one of its favorite maxims, that “he who asks, must do, equity.” In fact he has no e.quity to ask. The money is not his, but Mrs. Jeffries’. He has no claim to nor interest in it. That this is the law seems to be well settled, by the Supreme court of the United States, in DeWolf v. Johnson, 10 Wheat. U. S. R. 367, 393; and bj’’this court in Crenshaw’s adm’r v. Clark, &c., 5 Heigh, 65; and Spengler v. Snapp, Id. 478; all of which cases were cited in argument by the counsel for the appellees.
The court is further of opinion, that the bond of Dr. Gl.over, secured by the deed of trust in the proceedings mentioned, being fully due and payable, in good and lawful' money, subject only to the credits endorsed thereon; and there being no doubt as to the true balance due and unpaid on account of said debt; and the trustee in the deed having proceeded, in strict pursuance of its terms, to execute the trust thereof; he was doing a lawful act, in a lawful way, when his proceedings were arrested by the injunction awarded in this case. And *the court below might very well, not only have dissolved that injunction, but dismissed the bill.
But the court is further of opinion, that while that course might well have been pursued, that 'court had the power, at its election, to retain the cause, and have the trust executed under its superintendence and direction; as was done in the case of *841 Hogan v. Duke & als., 20 Gratt. 244, cited by the counsel for the appellant. That course seems to he convenient, as it saves the expense and necessity of another suit, in case one should he necessary, and it tends to ensure a due and faithful execution of the trust. Certainly, the debtor can have no good cause to complain of such a course.
The court is further of opinion, that there is nothing in that portion of the decree of the Circuit court, which directs the trustee in the said deed of trust to proceed to make a sale under and by virtue of the same, or which prescribes the place, manner and terms of such sale, of which the appellant has any just cause to complain. The trustee, by the express direction of the decree, must pursue the terms of the deed, except so far as the decree directs otherwise, and the decree directs otherwise, only in regard to the terms of the sale; the deed adopting the form prescribed by the Code, which provides that the sale shall be for cash; while the decree provides that the sale shall be for only so much cash as may be enough to pay expenses of the trust, including expenses of the sale and costs of the suit, and on a credit of one, two and three years, as to the balance of the purchase money. Surely the appellant has no cause to complain of this change of the terms prescribed by the deed, and he does not complain of it. But he complains that the decree directs the trustee to sell the whole of the tract of land conveyed by the deed; whereas the Code, p. S62, ch. 117, $ 6, which applies to this case, requires him to “sell the property conveyed by the deed, or so much thereof as may be necessary.” There is *no substantial variance between the Code and the decree in this respect. It was not the design of the framers of the Code to make any substantial innovation of the law in regard to deeds of trust, but merely to prescribe a general form for such deeds, where the parties do not prefer some other form. The object was, to save labor in the preparation of such instruments; and therefore the section provides that the sale shall be for cash, and of the property conveyed by the deed, or so much thereof as may be necessary. These terms were prescribed in reference to what was supposed to be suitable to a majority of cases of deeds of trust. When slavery existed, as was the case when the Code was adopted, slaves were a common subject for conveyance by deed of trust; and slaves were generally sold for cash. And, except when sold in families, were sold separately, and it was proper to sell only so many of them as were required to satisfy the purposes of the trust. The form of the deed of trust prescribed by the statute applies to “property” generally, and not to land alone. It is the duty of a trustee not to sell more of the trust subject than the purposes of the trust require, even though the deed direct him, in case of default, to sell the trust subject, without saying, “or so much thereof as may be necessary to satisfy the purposes of the trust.” That is always implied, unless a contrary intention plainly appears. The decree, therefore, in directing the trustee to sell, “under and by virlne of the trust deed,” the tract of land' thereby conveyed to him, is to be construed and read, as if the words, “or so much thereof as may be necessary,” followed the words above mentioned. In saying, “under and by virtue of the trust deed,” all the terms of the deed, and of the law on which it is founded, are, in effect, embodied in the decree, except such as are therein expressly varied. There is no ground to apprehend that the trustee will not execute his duties fairly and faithfully, and there is no suggestion of the kind in the bill. In x'his advertisement of the sale under the deed of trust, he stated that he would sell so much of the land as might be necessary to pay the balance due upon the debt and he will no doubt make the same, or a similar statement, in his advertisement of the sale under the decree; but whether he will or not, it will be his duty to sell only so much of the land as may be necessary for the purposes of the trust. We do not mean to say that he must sell precisely so much as may be sufficient to satisfy the purposes of the trust and no more. It may be difficult, or impossible to do this, and it may in fact be a breach of trust to do it. He cannot so divide and sell the land as to do unnecessary injury to the owner. He is the agent of both parties, and must consult and respect the rights of both. The sale of a part of a tract of land, may injuriously affect the sale or value of the ba lance; and it may be the duty of the trustee to sell the whole tract, or more of it than is required for the purposes of the trust, especially if desired by the owner of the land to do so. By duly considering the rights, interests, and wishes of the parties, an intelligent and faithful trustee will rarely find any difficulty in the discharge of his trust, and when he does, he can have the difficulty removed by invoking- the aid of a court of chancery for that purpose. In this case, the parties are already in court, and it will be easy to obtain that aid if necessary. There is no necessity for any preliminary reference to a commissioner to ascertain and report how much, and what part of the land should be sold. It is the duty' of the trustee to determine that question, and the presumption is that he is fully competent and able to do so. Should he meet with any difficulty in doing so, it will then be time enough to ask for such a reference.
The court is of opinion that there is no error in the decree of the Circuit court, and that it ought to be affirmed.
Decree affirmed.